NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 230428-U

Order filed May 4, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| GARRETT WHITE, Administrator of the Estate of Holly White, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County. |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | |
| IROQUOIS MEMORIAL HOSPITAL AND RESIDENT HOME, d/b/a IROQUOIS MEMORIAL HOSPITAL, an Illinois Corporation; RIVERSIDE MEDICAL CENTER, an Illinois Corporation; BROTULA EMERGENCY PHYSICIANS, LLC, an Illinois Limited Liability Company; ASSOCIATES OF INTEGRATED MEDICINE, LTD, d/b/a AIM HOSPITALISTS, LTD, an Illinois Corporation; SAINT DYKES, LLC, an Illinois Limited Liability Company; OBIDIKE A. NWAKUDU, M.D., Individually; RASHA ISSA, M.D., Individually; SARAH CLARE WHYTE, D.O., Individually; EMERGENCY PHYSICIANS MEDICAL GROUP, P.C., an Illinois Corporation; DANIEL ERRAMPALLI, M.D., Individually; and DIGESTIVE DISEASE CONSULTANTS OF KANKAKEE, S.C., an Illinois Corporation, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Appellate Court No. 3-23-0428 Circuit No. 19-L-52 |
| Defendants | ) ) | |
| (Iroquois Memorial Hospital and Resident | ) | |

Home, d/b/a Iroquois Memorial Hospital,       )
an Illinois Corporation; and Riverside        )
Medical Center, an Illinois Corporation,      )       Honorable
                                              )       Lindsay Parkhurst,
          Defendants-Appellees).              )       Judge, Presiding.

_____

          PRESIDING JUSTICE HETTEL delivered the judgment of the court.
          Justice Brennan and Justice Holdridge concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   The circuit court erred when it denied the plaintiff leave to file a fifth amended complaint, when it struck the plaintiff's expert disclosures and barred the experts from testifying, and when it granted partial summary judgment in favor of one of the defendant hospitals.

¶ 2    The plaintiff Garrett White, as the administrator of the estate of Holly White, brought medical negligence claims on behalf of his deceased mother against the defendants, Iroquois Memorial Hospital and Residential Home (Iroquois or IMH), Riverside Medical Center (Riverside or RHC), and several treating physicians. The plaintiff alleged, in relevant part, that Holly's doctors failed to adequately communicate whether a computed tomography (CT) scan had been performed on Holly at Iroquois before transporting her to Riverside and that Iroquois and Riverside were vicariously liable for the physicians' negligence. After filing four amended complaints, the plaintiff offered two expert witnesses, criticizing the hospitals' transfer protocol. Both hospitals moved to strike the experts, and Riverside moved for partial summary judgment on the issue of apparent agency. The circuit court granted both motions, and the plaintiff moved to reconsider, seeking leave to file a fifth amended complaint, which the circuit court denied. On appeal, the plaintiff argues that the circuit court: (1) abused its discretion in denying him leave to file an amended complaint and striking his expert disclosures; and (2) erred in granting partial summary judgment to Riverside. We reverse and remand for further proceedings.

2

¶ 3                                    I. MOTION ON APPEAL

¶ 4          As a threshold matter, we address the plaintiff's emergency motion for leave to supplement

the record on appeal *instanter* pursuant to Illinois Supreme Court Rule 329 (eff. July 1, 2017). The

plaintiff filed this motion on the eve of oral argument, and Riverside objected. We ordered the

motion taken with the case. Having considered the parties' arguments, we deny the plaintiff's

motion to supplement the record with discovery responses that were not presented to the circuit

court or otherwise contained in the record below. See *Kuykendall v. Schneidewind*, 2017 IL App

(5th) 160013, ¶ 29 (under Rule 329, the record may only be supplemented with documents that

were actually before the circuit court).

¶ 5                                      II. BACKGROUND

¶ 6                                    A. Factual Allegations

¶ 7          The following facts are taken from pleadings, depositions, admissions, and affidavits

contained in the record. On May 2, 2018, Holly arrived at Iroquois's emergency room department

(ER) around 2 p.m. complaining of sharp, stabbing abdominal pain. Nurse Bethany Brown initially

cared for Holly. Her review of Holly's records indicated that Holly had a prior history of gastric

bypass surgery, cholecystectomy (gallbladder removal), gastric ulcers, Cesarean section, and

intermittent dilations. She noted that Holly was restless and experiencing "ten-out-of-ten" pain.

¶ 8          Dr. Obidike Nwakudu, an ER physician, examined Holly when she arrived at Iroquois. His

initial examination revealed that Holly presented with upper abdominal tenderness. She

complained of severe abdominal pain radiating to her back and asked for pain medication. Dr.

Nwakudu ordered diagnostic blood and chemical tests and an ultrasound to rule out an abdominal

aortic dissection. The ultrasound showed no signs of a dissection, but the radiologist report was

limited due to extensive bowel distention. Dr. Nwakudu decided to immediately transfer Holly to

Riverside because it offered a higher level of care. He also noted that Holly's treating gastroenterologist, Dr. David Sutherland, had privileges there. Dr. Nwakudu did not order a CT scan because it would have required sedation, which would have delayed her transfer.

¶ 9 Prior to Holly's transfer, Dr. Nwakudu contacted Riverside and spoke with ER physician Dr. Sarah Whyte and hospitalist Dr. Rasha Issa. In his deposition, Dr. Nwakudu stated that he could not recall the specifics of their conversations but, based on his customs and practice, he would have discussed Holly's presenting condition, her medical history, the results of the testing conducted at Iroquois, and his belief that she needed a higher level of care based on the complexity of her case. Dr. Nwakudu testified that he did not mention a CT scan or CT scan results because a CT scan was not conducted. In their depositions, both Drs. Whyte and Issa stated that Dr. Nwakudu informed them that Holly had an ultrasound and a CT scan performed at Iroquois and the results were "normal."

¶ 10 Nurse William Baker, an Iroquois employee, was deposed in January 2021. He testified that he assessed Holly when she arrived in the ER. He charted that she was experiencing abdominal and back pain, feeling restless, and behaving strangely. He administered Morphine and Fentanyl to help with her pain. Later that evening, he oversaw Holly's transfer to Riverside. Holly left Iroquois by ambulance around 8 p.m. Nurse Baker checked the box on the emergency medical treatment transfer form indicating that Holly's medical records, imaging, and lab results were sent with her or faxed to Riverside.

¶ 11 The plaintiff deposed Nurse Laura Rivera, a Riverside employee, in March 2020. She testified that when Holly arrived at Riverside's emergency department at approximately 9 p.m., she was screaming and crying for help. The emergency medical technicians (EMTs) who delivered Holly gave Nurse Rivera a transfer form from Iroquois, but the EMTs did not have Holly's medical

4

documents. Holly told Nurse Rivera that she continued to have "ten-out-of-ten" pain. According to Nurse Rivera's deposition testimony, Dr. Whyte informed her that Holly had a CT scan at Iroquois and the results of the scan were normal. Nurse Rivera administered Morphine and other gastrointestinal medication to relieve Holly's pain.

¶ 12　　In her deposition, Dr. Whyte testified that when she spoke with Dr. Nwakudu before Holly arrived, he stated that Holly's labs and tests were normal. Looking at her chart entry, she stated: "He told me that adult female with abdominal pain, GI specialist, and that she had a negative CT and ultrasound and labs were normal." Dr. Whyte assessed Holly in the emergency department around 9:12 p.m., noting that her bowel sounds were normal and her stomach was soft and without distension or tenderness. She diagnosed Holly with generalized abdominal pain and opioid dependence with opioid-induced disorder because she continued to ask for pain medication even though she had been given Morphine and Fentanyl at Iroquois.

¶ 13　　Dr. Whyte testified she did not receive any of Holly's medical reports from Iroquois, nor did she ask for them. She testified that "[t]ypically, those reports are given to the secretary in order to be scanned in to [*sic*] the medical records." Based on her impression that Holly had a CT scan at Iroquois, Dr. Whyte did not conduct a repeat CT scan. At the time she treated Holly, Dr. Whyte was not an employee of Riverside but instead was employed by Emergency Physicians Medical Group.

¶ 14　　At approximately 9:30 p.m., hospital personnel presented Holly with a "TREATMENT AGREEMENTS AND AUTHORIZATIONS" form (consent form). In relevant part, the consent form stated:

> "I acknowledge and understand that there will be physicians, consultants, surgeons, hospital-based physicians such as pathologists, radiologists, emergency physicians,

5

anesthesiologists, hospitalists, and non-physician providers (CRNAs, nurse practitioners, physician assistants) and surgical vendor representatives, who provide services at RHC who are not employees or agents of RHC but instead are independent medical practitioners or contractors. I understand that each of these providers exercises his or her own, independent medical judgment and is solely responsible for the care, treatment, and services that he or she orders, requests, directs, or provides. I acknowledge that these practitioners are not subject to the supervision or control of RHC and that the employment or agency status of physicians and other providers who treat me is not relevant to my selection of RHC for my care."

Holly gave verbal consent to its contents but did not sign the form. The patient signature line contains the following handwritten notation: "Pt Gave verbal to consent." The form was time stamped 21:33 and contains a witness's signature.

¶ 15        Dr. Issa admitted Holly to Riverside's general medical floor and initially assessed her condition around 11 p.m. on May 2. Holly told her that she woke up that morning with severe abdominal pain. Given Holly's symptoms and her physical assessment, Dr. Issa believed Holly was exhibiting drug-seeking behavior.

¶ 16        In his deposition, Dr. Daniel Errampalli, an attending gastroenterologist at Riverside, testified that he first saw Holly on May 3. Holly continued to complain that her pain radiated to her back. Dr. Errampalli acknowledged that, unlike Holly's prior abdominal examinations, his examination indicated that her stomach was tender and slightly bloated. His differential diagnosis was that Holly was suffering from a peptic ulcer, enflamed gallbladder, anemia, and

thrombocytosis. He considered additional imaging but not a CT scan because Drs. Whyte and Issa's records noted negative CT results on May 2.

¶ 17    Nurse Schreiber initially examined Holly around 8 p.m. on May 3. She charted that Holly's abdomen was "rounded" with hypoactive bowel sounds, meaning less than normal. She did not inform a physician of the change in Holly's condition.

¶ 18    At approximately 4 a.m. on May 4, nurses found Holly unresponsive on the floor of her hospital room. A CT scan revealed a bowel obstruction. Doctors performed emergency surgery, discovered Holly's intestines were ischemic and gangrenous, and removed a large portion of her small intestines. Holly suffered cardiac arrest and died on May 6, 2018.

¶ 19                              B. Procedural History

¶ 20    The administrator of Holly's estate filed suit on May 9, 2019,[1] alleging medical negligence against Iroquois, Dr. Nwakudu, Riverside, Dr. Issa, and others, and named Dr. Whyte and Nurse Rivera as respondents in discovery. The complaint alleged, in relevant part, that Iroquois was medically negligent "both as an institution and through the acts and omissions of its duly authorized employees, agents, and apparent agents including DR. NWAKUDU" in that it: (1) "[f]ailed to either: ensure that a CT scan of the abdomen was performed on HOLLY prior to transfer, or ensure that a CT scan of the abdomen was performed on HOLLY upon arrival at RIVERSIDE;" (2) "[f]ailed to notify RIVERSIDE that HOLLY had not received a CT scan of the abdomen"; and (3) "[f]ailed to document that HOLLY had not received a CT scan of her abdomen[.]" The complaint similarly alleged that Riverside was medically negligent "both as an institution and through the acts and omissions of its duly authorized employees, agents, and

_____

[1] Shawn Lane was initially named as the administrator of Holly's estate and filed suit on the estate's behalf.

7

apparent agents including DR. ISSA" in that it "[f]ailed to confirm with Iroquois as to whether they performed a CT scan of HOLLY's abdomen prior to transfer to RIVERSIDE, and if so, confirm normal finding(s)."

¶ 21    Iroquois moved to dismiss the counts against it, claiming the plaintiff failed to include an appropriate medical malpractice certificate (see 735 ILCS 5/2-622 (West 2022)). Notably, Iroquois' motion to dismiss stated, in part, that "[p]laintiff's complaint indicates that there are also institutional negligence allegations against [Iroquois], and therefore, at a minimum, [Iroquois] is entitled to know that a physician has certified that there is a meritorious cause of action against it for the allegations of institutional negligence."

¶ 22    In response, the plaintiff filed an amended complaint. Counts I and II of the first amended complaint alleged medical negligence in that Iroquois "both as an institution and through the acts and omissions of its duly authorized employees, agents, and apparent agents including DR. NWAKUDU[:]" (1) "[f]ailed to either: ensure that a CT scan of the abdomen was performed on HOLLY prior to transfer; or ensure that a CT scan of the abdomen was performed on HOLLY upon arrival at RIVERSIDE;" and (2) "[f]ailed to document that HOLLY had not received a CT scan of her abdomen[.]" Counts VII and VIII claimed medical negligence against Riverside "both as an institution and through the acts and omissions of its duly authorized employees, agents, and apparent agents including DR. ISSA," alleging, among other things, that the hospital: (1) "[i]nappropriately charted that prior to her arrival at RIVERSIDE on 5/2/18, HOLLY had received a CT scan of the abdomen;" (2) "[i]nappropriately charted that the results were normal regarding a CT scan of HOLLY's abdomen performed at IROQUOIS on 5/2/18;" (3) "[i]nappropriately charted that the results of the abdominal ultrasound at IROQUOIS was normal;" and (4) "[f]ailed

to confirm with IROQUOIS as to whether they performed a CT scan of HOLLY's abdomen prior to transfer to RIVERSIDE, and if so, confirm normal finding(s)."

¶ 23    The plaintiff attached a section 2-622 certificate to the amended complaint identifying the same claims of medical negligence against Iroquois and Riverside, through the acts and omissions of Dr. Nwakudu and Dr. Issa. In relevant part, the certificate alleged that the hospitals were vicariously liable because Drs. Nwakudu and Issa deviated from the standard of care in failing to document that Holly did not have a CT scan of her abdomen and inappropriately charting that a CT scan had been conducted at Iroquois with normal results.

¶ 24    Iroquois and Riverside answered the first amended complaint, denying the substantive allegations and claiming that Drs. Nwakudu and Issa were not their actual or apparent agents. The plaintiff filed a motion for leave to file a second amended complaint, seeking to add other doctors and nurses as respondents in discovery. Before the circuit court ruled on that motion, the plaintiff filed another motion for leave to file a third amended complaint, which the court granted.

¶ 25    The plaintiff filed a third amended complaint on May 5, 2020. The substantive allegations against Iroquois, Riverside, Dr. Nwakudu, and Dr. Issa were the same as before, as were the allegations contained in the section 2-622 certificate. In addition, the third amended complaint still named Nurse Rivera and Dr. Whyte as respondents in discovery. The only change germane to this appeal was the addition of Nurse Baker, Nurse Brown, and Dr. Errampalli as respondents in discovery.

¶ 26    On February 22, 2021, a fourth amended complaint was filed substituting Holly's son, Garrett, as the administrator of her estate. The complaint converted Dr. Whyte and Dr. Errampalli to named defendants and removed Nurses Rivera, Baker, and Brown from the lawsuit. It also added vicarious liability counts against Riverside for medical negligence through its agents, Drs. Whyte

and Errampalli. The allegations of negligence within those counts mirrored those previously alleged against its agent, Dr. Issa.

¶ 27 On October 6, 2022, the plaintiff submitted discovery disclosures pursuant to Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018). Among other information, the plaintiff disclosed Tracy Fremming, a registered nurse specializing in emergency room nursing, and Dr. Cam Patterson, a board-certified internal medicine physician. Nurse Fremming was expected to testify that Nurses Baker, Rivera, and Schreiber deviated from the standard of care in treating Holly. She criticized Nurse Baker and Nurse Rivera for failing to ensure that Holly's medical records were sent by Iroquois and received by Riverside. She also claimed that Nurse Schreiber was negligent in failing to immediately report her noted change in Holly's abdomen on May 3, 2018.

¶ 28 Dr. Patterson's expected testimony claimed that both Iroquois and Riverside "failed to act as reasonably careful institutions in their failure to ensure [Holly] received a CT scan of her abdomen, that those results were understood and properly conveyed to the other institution, that her records were available for review, and that her care team had a complete understanding of her medical condition so that they could properly treat her." His disclosure provided that the standard of care required Riverside and Iroquois to have policies, protocols, and procedures for communicating test and imaging results from one provider to another provider at an accepting hospital. He opined that both hospitals failed to maintain clear protocols governing the transfer of patent records and failed to ensure that their staff understood any transfer policies that may have existed.

¶ 29 Riverside and Iroquois jointly moved to strike Nurse Fremming's and Dr. Patterson's opinions and bar them from testifying at trial. Specifically, the hospitals claimed that, while the complaint alleged they were medically negligent, they lacked notice of institutional and nursing

10

negligence. More specifically, Riverside argued that none of the allegations directed against it in prior complaints included assertions that it failed to maintain policies, protocols, or procedures regarding patient transfers or claims of negligence against their nurses.

¶ 30 Riverside also filed a motion for partial summary judgment as to vicarious liability, claiming that the plaintiff could not demonstrate, under any set of facts, that Drs. Whyte, Issa, and Errampalli were apparent agents of the hospital. Riverside attached eight consent forms Holly signed while receiving treatment at Riverside, dating from 2018 back to 2008.[2] Holly signed three of the forms when she visited Riverside on January 25, 2017; October 4, 2017; and January 3, 2018. They contained the same "CONSENT FOR TREATMENT" paragraph as the form Holly verbally acknowledged on May 2, 2018.

¶ 31 Holly signed the remaining five consent forms attached to the motion between October 2008 and July 2009. Those forms contained identical consent-to-treatment provisions, stating, in relevant part:

> "**I understand that the physicians on staff at Riverside Medical Center, including attending physicians, consultants, surgeons, and hospital-based physicians, such as pathologist, radiologist, emergency department physicians, and anesthesiologist are not agents or employees of the hospital and exercise their own independent medical judgment.**" (Emphasis in original.).

¶ 32 Following a hearing, the circuit court issued a written order granting the hospitals' joint motion to strike the plaintiff's Rule 213(f)(3) disclosures. The court barred both experts from testifying at trial, finding their opinions irrelevant and unrelated to the claims contained in the

---

[2] Both the circuit court's order and Riverside's brief on appeal reference nine *signed* consent forms. We have carefully reviewed the record and find evidence of only eight treatment authorization forms that Holly signed between 2008 and 2018.

plaintiff's previously filed complaints. While the plaintiff's intention to file a fifth amended complaint was discussed, and the circuit court briefly addressed a fifth amended complaint in it written order, a fifth amended complaint had not been filed and no ruling was issued on it.

¶ 33 In a separate order, the court also granted Riverside's motion for partial summary judgment as to actual and apparent agency of the plaintiff's treating physicians. The court held that the plaintiff failed to provide any evidence suggesting that Drs. Issa, Whyte, and Errampalli were actual agents of Riverside. It further found the eight consent forms the plaintiff signed between 2008 and 2018 contained "clear and unambiguous" language that emergency department physicians at the hospital were not agents or employees of Riverside. Accordingly, the court concluded that Holly could not demonstrate that Riverside "held out" the treating physicians as hospital employees rather than independent contractors.

¶ 34 Notably, Iroquois also moved for summary judgment on the issue of apparent agency. The circuit court denied Iroquois's motion, finding that the consent forms Holly signed while receiving treatment at Iroquois did not clearly state that Dr. Nwakudu was an independent contractor and, thus, created a genuine issue of material fact as to whether Iroquois held him out as an agent or employee of the hospital.

¶ 35 The plaintiff moved to reconsider the court's order granting Riverside partial summary judgment. At the same time, the plaintiff filed another motion, in which the plaintiff not only sought reconsideration of the court's order barring Nurse Fremming and Dr. Patterson from testifying, but also requested leave to file a fifth amended complaint pursuant to section 2-616(b) of the Code of Civil Procedure (Code) (735 ILCS 5/2-616(b) (West 2022)).

¶ 36 The plaintiff attached the proposed fifth amended complaint to the motion. The complaint alleged two counts of "institution negligence" against Iroquois, claiming that it: (1) "[f]ailed to

12

ensure that its providers followed the ED [Emergency Department] 'Transfer of Patient' policy, in that the ED staff did not properly convey to Riverside accurate details of Holly's condition, tests performed, and results of any testing that was done, or if additional testing was needed;" (2) "[f]ailed to ensure that its providers were aware of how to safely and accurately effectuate the transfer of a patient, pursuant to policy, procedure, and protocol of IMH, by correctly completing the transfer form and providing paper and disc copies of records to Riverside;" and (3) "[f]ailed to coordinate Holly's care with the accepting Riverside practitioners[.]" Similarly, it asserted new counts of "institutional negligence" against Riverside, alleging, among other things, that it: (1) "failed to have a policy, procedure, or protocol in place to ensure that a patient's records, imaging, test results, and chart were received from an outside institution, when the patient is being transferred to Riverside[;]" (2) failed to ensure that tests were ordered "if a patient arrives at Riverside without her records, imagining, [and] test results[;]" and (3) failed "to have a policy, procedure, or protocol that coordinated care among providers at Riverside[.]" The amended complaint also included "nursing negligence" counts against Iroquois for Nurse Baker's failure to follow transfer protocol and against Riverside for Nurse Rivera's failure to follow proper charting procedures. In the nursing negligence counts, the complaint named a new nurse, Nurse Schrieber, and alleged that Riverside was negligent through her conduct in failing to recognize the significance of Holly's abdominal changes on May 3, 2018. The defendants objected to the plaintiff's request to amend the complaint.

¶ 37        The circuit court denied the motions to reconsider. The court also denied the plaintiff's request for leave to amend after finding that the plaintiff had "failed to establish any of the four factors enumerated in [*Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263 (1992)]" The court also concluded:

13

"The court finds Defendants are surprised and prejudiced because plaintiff first alleged nursing malpractice and institutional malpractice 5 years after the occurrence, 4 years after filing the original complaint, and 30 days after summary judgment was granted in favor of Defendants. The court notes Plaintiff never alleged these causes in the 1st, 2nd, 3rd, or 4th Amended complaints. This delay denied Defendants the time to develop a defense over the course of the case during fact discovery and examination of witnesses at deposition. Thus, the court finds the Defendants were denied a fair opportunity to investigate the circumstances of liability related to the proposed amendments while such facts were accessible for the subsequent claim when memories were fresh and not faded, and denied them the opportunity and the ability to preserve evidence related to the amended claims. Thus they are surprised and unprepared to respond to new theories at trial."

¶ 38       The circuit court found no just reason to delay enforcement or appeal. The plaintiff then filed this interlocutory appeal pursuant to Illinois Supreme Court Rule 304(a) (eff. March 8, 2016).

¶ 39                                III. ANALYSIS

¶ 40                    A. Leave to File Fifth Amended Complaint

¶ 41       On appeal, the plaintiff first argues that the circuit court erred in denying him leave to file a fifth amended complaint. He primarily argues that under the test adopted by our supreme court in *Loyola*, the circuit court should have granted leave to amend.

¶ 42       At any time before final judgment, amendments to a complaint may be allowed "on just and reasonable terms." 735 ILCS 5/2-616(a) (West 2022). Requests to amend should be liberally construed. *Tomm's Redemption, Inc. v. Hamer*, 2014 IL App (1st) 131005, ¶ 13. The primary

consideration is "whether the allowance of the amendment further the ends of justice." *American National Bank & Trust Co. of Chicago v. Dozoryst*, 256 Ill. App. 3d 674, 679 (1993).

¶ 43    Generally, courts look to four factors in determining whether to grant or deny leave to amend: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Loyola Academy v. S & S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992). While case law exists for the proposition that the party seeking to amend a complaint must show that *all* four factors weigh in favor of allowing leave to amend, *Loyola* itself does not stand for that proposition. *Hiatt v. Illinois Tool Works*, 2018 IL App (2d) 170554, ¶ 38. In *Loyola*, our supreme court held that based on the facts of that case, "[i[n light of the fact that the amendment did meet all four factors, we find that the denial of the motion to amend was prejudicial error as a result of a manifest abuse of discretion." *Loyola*, 146 Ill. 2d at 276. In other words, the more the factors weigh in favor of the party seeking amendment, the more likely an abuse of discretion will be found when a circuit court denies leave to amend. See *id.*

¶ 44    The circuit court has broad discretion in deciding whether to grant leave to amend a pleading prior to entry of final judgment. *Loyola*, 146 Ill. 2d at 273-74. However, this court conducts its own *Loyola*-factor analysis, independent of that of the circuit court. *Shrock v. Meyer*, 2024 IL App (1st) 230069, ¶ 43.

¶ 45    The first *Loyola* factor, "whether the proposed amendment would cure the defective pleading" (*Loyola*, 146 Ill. 2d at 263), is inapplicable here. The plaintiff's fifth amended complaint did not seek to cure a defective pleading.

15

¶ 46    Under the second *Loyola* factor, we note that prejudice can exist when delay in seeking an amendment inhibits the nonmoving party's ability to present its case (*Bloom v. Landy*, 72 Ill. App. 3d 383, 400 (1979)) or the "delay before seeking an amendment leaves a party unprepared to respond to a new theory at trial" (*Miller v. Pinnacle Door Co.*, 301 Ill. App. 3d 257, 261 (1998)). Here, the hospitals argue that, because the plaintiff's prior complaints sought to hold them liable *vicariously* for allegedly negligent acts and omissions performed by the doctors who treated Holly at the hospitals, the prior complaints did not give the hospitals notice that the plaintiff would assert claims against the hospitals *directly* for their institutional failure to develop or enforce adequate policies for the transfer of patients and the communication of medical information following such transfers. The hospitals maintain that the latter claims are of a completely different character from the former claims because they involve different actions taken by different individuals at different times. The hospitals argue that they will incur substantial prejudice if they are required to defend against the plaintiff's new claims and his new theory of recovery at this late stage in the litigation. We find these contentions unpersuasive.

¶ 47    Initially, we note that in the original complaint, the plaintiff alleged that Iroquois and Riverside were medically negligent "***both as an institution*** and through the acts and omissions of its duly authorized employees, agents, and apparent agents" (emphasis added), including Drs. Nwakudu, Issa and Whyte. Further, Iroquois even acknowledged the institutional negligence allegations in its initial motion to dismiss, stating that "[p]laintiff's complaint indicates that there are also institutional negligence allegations against [Iroquois], and therefore, at a minimum, [Iroquois] is entitled to know that a physician has certified that there is a meritorious cause of action against it for the allegations of institutional negligence." Thus, from the beginning of this

16

case, the hospitals were on notice that the plaintiff might seek to hold them directly liable for any acts they performed that contributed to the medical failures that led to Holly's death.

¶ 48    Moreover, a defendant hospital in a medical malpractice case is not prejudiced by amended allegations of direct liability against it merely because the plaintiff's prior complaints alleged only vicarious liability. See, *e.g.*, *Ruff v. Northwestern Memorial Hospital*, 159 Ill. App. 3d 811, 817-18 (1987) (finding an abuse of discretion in not allowing leave to amend to add direct liability claims even after summary judgment had been granted on the vicarious liability claims). Cases holding to the contrary, such as *Weidner v. Carle Foundation Hospital*, 159 Ill. App. 3d 710 (1987), were decided prior to our supreme court's adoption of the "sufficiently-close-relationship test" in *Porter v. Decatur Memorial Hospital*, 227 Ill. 2d 343 (2008), which relaxed the standard used to determine whether new claims raised in an amended complaint relate back to claims raised in prior complaints (*id.* at 352-60).

¶ 49    In *Porter*, our supreme court explained that "[t]he purpose of the relation-back doctrine of section 2-616(b) is to preserve causes of action against loss by reason of technical default unrelated to the merits" while affording a defendant "a fair opportunity to investigate the circumstances upon which liability is based while the facts are accessible." *Id.* at 355. However, such concerns do not supersede considerations of whether a defendant has given adequate notice and knowledge of the incident giving rise to the claim. *Id.* at 358. An amendment does not relate back if "(1) the original and amended set of facts are separated by a significant lapse of time, or (2) the two sets of facts are different in character, as for example when one alleges a slander and the other alleges a physical assault, or (3) the two sets of facts lead to arguably different injuries." *Id.* at 359.

17

¶ 50    The *Porter* court found "a sufficiently close relationship" between the allegations in the plaintiff's second amended complaint and his timely filed first amended complaint to show that the later allegation grew out of the same transaction or occurrence set up in the earlier one. *Id.* at 361. According to the court:

> "The two allegations were part of the same events leading up to the same ultimate injury for which damages are sought. They were closely connected in both time and location. They were also similar in character and general subject matter, as they involved allegations of medical malpractice that resulted in failure to appreciate plaintiff's diminishing neurological status. Furthermore, *the Hospital was on notice from the earlier allegation* that plaintiff was asserting negligent treatment by the employees and agents of the Hospital in failing to appreciate and report diminishing neurological status." (Emphasis added.) *Id.*

The court concluded that "the allegations in plaintiff's second amended complaint about [the radiologist's] reading of the CT scan was an amplification that grew out of the earlier allegation about failing to report diminishing neurological function, both of which arose out of the same transaction or occurrence." *Id.* at 363.

¶ 51    In this case, the plaintiff's new claims against both the hospitals and the nurses were part of the same course of medical negligence alleged in the prior complaints. In his previous complaints, the plaintiff alleged that Drs. Nwakudu, Issa and Whyte failed to order a CT scan and to confirm that no CT scan had been previously performed. He claimed that these failures (among others) led to Holly's' death. In his proposed fifth amended complaint, the plaintiff alleged that the hospitals failed to develop or enforce policies that would have ensured that a CT scan had been performed and that the results of the scan were communicated to the plaintiff's treaters. The

18

plaintiff further alleged that nurses Baker and Rivera failed to ensure that Holly's medical records were received from Iroquois. He further alleged that nurse Schreiber had failed to inform Holly's physicians of changes in Holly's abdomen condition. The negligence alleged in both the earlier complaints and the proposed fifth amended complaint concerned the same treatment of the same patient in the same places during the same time period, which resulted in the same injury.

¶ 52    In addition, the allegations in each complaint centered around the same subject matter. Each complaint was predicated on (1) the defendants' alleged failure to communicate or confirm vitally important medical information, including whether a CT scan had been performed, and (2) the defendants' negligent diagnosis, assessment, evaluation, and treatment of Holly's condition at the hospitals. Accordingly, the allegations in the plaintiff's prior complaints gave the hospitals notice of the claims raised in the proposed fifth amended complaint, and the latter claims related back to the timely claims raised in the earlier complaints. See, *e.g.*, *id.* at 361 (holding that allegations set forth in an amended medical malpractice complaint against a different doctor for different acts of negligence related back to the allegations set forth in the original complaint because the new allegations were closely connected in time and subject matter to the original allegations, were part of the occurrence or series of events that formed the basis of the prior allegations, and resulted in the same alleged harm); see also *Simkins v. HSHS Medical Group, Inc.*, 2017 IL App (5th) 160478.

¶ 53    Bare allegations of prejudice by the party opposing leave to amend will not suffice to show prejudice. *Hiatt*, 2018 IL App (2d) 170554, ¶ 39. Here, the hospitals claim—and the circuit court found—that allowing the proposed amendment would render the hospitals unable to investigate and develop defenses to the plaintiff's new claims while the evidence relevant to those claims was accessible and the memories of any relevant witnesses were fresh. However, the hospitals have

not identified what evidence they would have preserved or what deposition testimony they would have obtained if the plaintiff had raised his amended claims earlier. Such vague allegations of prejudice are insufficient. See *Hiatt*, 2018 IL App (2d) 170554, ¶¶ 39-40 (holding that (1) in order to demonstrate prejudice resulting from the filing of an amended complaint, the opposing party "must show substantively what [it] might find or precisely how any further discovery might bear on [his] case," and (2) that the opponent's "bare assertion" that he "would have submitted different written discovery and asked different questions of the numerous deponents" did not establish prejudice (citations and internal quotation marks omitted)).

¶ 54     The hospitals have made no showing in this case that the proposed amendment would inhibit the presentation of its case on the merits. The hospitals' policies or protocols governing the transfer of patients and the communication of a patient's medical information between the hospitals (if any) are clearly in the hospital's possession. The treatment records of nurses Baker, Rivera, and Schreiber should also be in the hospitals' possession, because the Hospital Licensing Act requires all licensed hospitals to preserve a patient's medical records for at least 10 years. 210 ILCS 85/6.17(c) (West 2024). While it is not accurate to claim, as the plaintiff has, that this case is "still in the pleadings stage," we do note that discovery is still ongoing. Any possible prejudice caused by the hospital's supposed inability to obtain information from relevant witnesses could be mitigated by re-opening fact discovery, which would not be unduly burdensome given that the defendants have not even disclosed their experts yet. Under the circumstances of this case, we find that the second *Loyola* factor weighs in favor of the plaintiff.

¶ 55     We further find that the third and fourth *Loyola* factors—whether the amendment was timely and whether the plaintiff had previous opportunities to amend—also weigh in favor of the plaintiff. As previously noted, pleadings can be amended at any time prior to final judgment "on

20

just and reasonable terms." 735 ILCS 5/2-616(a) (West 2022). Additionally, the new claims also relate back to the claims and allegations set forth in the previous complaints. See *Porter*, 227 Ill. 2d at 361; *Simkins*, 2017 IL App (5th) 160478, ¶¶ 29-32. Furthermore, the new claims were based, in part, on information obtained later during discovery. Medical negligence actions like the instant case are complex and their course can change significantly as discovery progresses. Given that section 2-616 "is to be liberally construed so that cases are decided on their merits and not on procedural technicalities," (*Pry v. Alton & Southern Railway Co.*, 233 Ill., App. 3d 197, 213 (1992)), under the circumstances of this case, we hold that the *Loyola* factors weigh in favor of allowing leave to amend and that the circuit court therefore abused its discretion when it denied the plaintiff leave to file his fifth amended complaint.

¶ 56                                    B. Rule 213 Disclosures

¶ 57        The plaintiff also maintains that the circuit court's error in denying him leave to file his fifth amended complaint led to other errors—namely, striking Dr. Patterson's and Nurse Fremming's Rule 213 disclosures and barring their testimony at trial.

¶ 58        Initially, we note that the circuit court granted the motion to strike the plaintiff's Rule 213 disclosures *before* the plaintiff actually requested leave to file a fifth amended complaint. Thus, it is inaccurate for the plaintiff to claim that the denial of leave to file his fifth amended complaint *led* to the erroneous striking of his Rule 213 disclosures. Nevertheless, because the court's ruling on the motion to strike was up for reconsideration at the time the motion for leave to amend was being considered, we will consider the merits of the plaintiff's argument.

¶ 59        Illinois Supreme Court Rule 213 (eff. Jan. 1, 2018) is a rule of discovery practice that requires parties to furnish the identities of expert witnesses who are expected to testify at trial, disclose their qualifications, reveal the subject matter of their testimony, and provide grounds on

21

which their opinions are based. Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 2007). The purpose behind Rule 213 "is to avoid surprise and discourage tactical gamesmanship." *Gee v. Treece*, 365 Ill. App. 3d 1029, 1038 (2006). As previously stated, the hospitals were neither surprised nor prejudiced by the new claims in the fifth amended complaint and the new claims related back. *Supra* ¶¶ 45-53. Additionally, there is nothing in this record to support a claim that tactical gamesmanship was behind Dr. Patterson's and Nurse Fremming's Rule 213 disclosures. Given the purpose of Rule 213 and our conclusion that the circuit court abused its discretion in denying the plaintiff leave to file a fifth amended complaint, we likewise hold that the court abused its discretion when it struck Dr. Patterson's and Nurse Fremming's Rule 213 disclosures and barred their testimony.

¶ 60                     C. Riverside's Motion for Partial Summary Judgment

¶ 61         Next, the plaintiff contends the circuit court erred in granting Riverside's motion for partial summary judgment on the issue of apparent agency by relying on the hospital's consent forms. He claims Riverside's consent forms failed to clearly notify Holly that her treating physicians were independent contractors and maintains that triable issues of fact exist as to whether (1) the hospital "held out" the doctors as employees and (2) Holly justifiably relied on the hospital to provide her care.

¶ 62         A summary judgment motion is used to determine whether a genuine issue of fact exists. *Ory v. City of Naperville*, 2023 IL App (3d) 220105, ¶ 17. Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2022). In deciding whether a genuine issue of material fact exists, courts must construe the evidence "strictly against the movant and liberally in favor of the opponent." (Internal quotation marks omitted.) *Ory*, 2023 IL App (3d) 1252, ¶ 17. "A triable issue

22

of fact exists where there is a dispute as to the material facts or where, although the facts are not in dispute, reasonable minds might differ in drawing inferences from those facts." *Petrovich v. Share Health Plan of Illinois, Inc.*, 188 Ill. 2d 17, 31 (1999). We review a circuit court's order granting summary judgment *de novo*. *Ory*, 2023 IL App (3d) 1252, ¶ 18.

¶ 63 Apparent agency functions like estoppel. *Williams v. Tissier*, 2019 IL App (5th) 180046, ¶ 30. Courts "will not hear the principal's denials of agency to the prejudice of an innocent third party who has been led to reasonably rely upon the agency and is harmed as a result." *Id.* (citing *Petrovich*, 188 Ill. 2d at 31). Unless a patient knew or should have known that the physician providing treatment was an independent contractor, the hospital may be held liable for the negligent acts of the physician under the apparent authority doctrine. *Petrovich*, 188 Ill. 2d at 32. Generally, whether an apparent agency relationship exists is a question of fact for the trier of fact to decide. See *Stewart v. Jones*, 318 Ill. App. 3d 552, 561 (2001).

¶ 64 In *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511 (1993), the Illinois Supreme Court identified three factors necessary to establish a hospital's vicarious liability under the doctrine of apparent authority, *i.e.*, apparent agency. A plaintiff must show that:

> "(1) the hospital, or its agent, acted in a manner that would lead a reasonable person to conclude that the individual who was alleged to be negligent was an employee or agent of the hospital; (2) where the acts of the agent create the appearance of authority, * * * the hospital had knowledge of and acquiesced in them; and (3) the plaintiff acted in reliance upon the conduct of the hospital or its agent, consistent with ordinary care and prudence." (Internal quotation marks omitted.) *Id.* at 525.

¶ 65 1. *"Holding Out" Element*

23

¶ 66 The first two *Gilbert* factors are frequently combined and referred to as the "holding out" element of apparent agency. See *Lamb-Rosenfeldt v. Burke Medical Group, Ltd.*, 2012 IL App (1st) 101558, ¶ 26; *Tissier*, 2019 IL App (5th) 180046, ¶ 47. The holding out element does not require a showing that the hospital made an express representation that the allegedly negligent provider was an employee. *Gilbert*, 156 Ill. 2d at 525. A plaintiff may satisfy the holding out element by showing that the hospital held itself out as a provider of care without informing the patient that an independent contractor provided the care. *Id.* Conversely, if a patient knew or should have known that the treating physician was an independent contractor, the apparent agency relationship fails. *Churkey v. Rustia*, 329 Ill. App. 3d 239, 243 (2002).

¶ 67 Hospitals frequently rely on signed consent forms containing "independent-contractor" disclosures as proof that a plaintiff knew or should have known of the independent-contractor status of a treating physician. See *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 30; *James v. Ingalls Memorial Hospital*, 299 Ill. App. 3d 627, 633 (1998). While not dispositive, a signed consent form containing a clear, concise, and unambiguous independent-contractor disclaimer is an important fact to consider in evaluating the holding out element. *James*, 299 Ill. App. 3d at 633.

¶ 68 In determining the effect of independent-contractor disclaimers in consent forms, Illinois reviewing courts have upheld summary judgment orders where the consent forms clearly and unambiguously disclaim an agency relationship. See *Delegatto v. Advocate Health & Hospitals*, 2021 IL App (1st) 200484, ¶¶ 9, 47; (summary judgment affirmed where patient signed "clear and unambiguous" consent form stating: "I UNDERSTAND THAT ALL PHYSICIANS, NURSE PRACTIONERS, *** AND THE LIKE, ARE INDEPENDENT CONTRACTORS AND ARE NOT EMPLOYEES OR AGENTS OF THE HOSPITAL." (Emphasis in original.)); *Mizyed v. Palos Community Hospital*, 2016 IL App (1st) 142790, ¶¶ 15, 62 (summary judgment affirmed

24

based on "unambiguous language" in consent forms stating: "**I understand that all physicians providing services to me \*\*\* are independent medical staff physicians and are not employees or agents of [the hospital].**" (Emphasis in original.)); *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶¶ 4, 30 (language in multiple consent forms was clear that physicians were not hospital employee where the form stated that "NONE OF THE PHYSICIANS WHO ATTEND TO ME AT THE HOSPITAL ARE AGENTS OR EMPLOYEES OF THE HOSPITAL." (Emphasis in original.)).

¶ 69        On the other hand, courts have held that less definitive language in a hospital's consent form leads to ambiguity. Where the independent-contractor disclaimer is confusing or lacks clarity, courts have concluded that a genuine issue of material fact exists regarding whether the hospital "held out" the physician as an employee or agent. See *Tissier*, 2019 IL App (5th) 180046, ¶¶ 48, 52 (summary judgment in hospital's favor reversed where patient testified she was "confused" by disclaimer language that was "buried" within a 16-paragraph document in fine print and did not identify obstetricians as independent contractors); *Hammer v. Barth*, 2016 IL App (1st) 143066, ¶¶ 5, 24 (genuine issue of material fact existed as to whether consent form adequately notified patient of physician's status where form stated: "I acknowledge and fully understand that *some or all* of the physicians who provide medical services to me \*\*\* are not employes or agents of the hospital[.]" (emphasis added)); *Schroeder v. Northwest Community Hospital*, 371 Ill. App. 3d 584, 587, 593 (2006) (summary judgment reversed based on "extremely confusing" disclaimer language that provided: "Your care will be managed by your personal physician or other physicians who are not employed by [the hospital]. \*\*\* Like your physician, those consultants have privileges to care for patients at this facility, but are not employed by [the hospital]."); see also *First Midwest Bank v. Ottawa Regional Hospital & Healthcare Center*, 2023 IL App (3d)

25

220008, ¶ 36 (consent forms providing that "most physicians *** providing services at Hospital are *INDEPENDENT HEALTHCARE PRACTIONERS*" were not clear and unambiguous disclaimers (emphasis in original)).

¶ 70 Comparing these cases, we conclude that the language in Riverside's consent forms more closely tracks the phraseology used in *Hammer*, *Schroeder*, and *First Midwest Bank* and does not clearly state that Drs. Whyte, Issa, and Errampalli were independent contractors. The consent forms Holly signed and verbally acknowledged between 2017 and 2018 state "there will be physicians *** who provide services at [Riverside] who are not employees or agents of [Riverside] but instead are independent medical practitioners or contractors." The relevant disclaimer language in those forms lends itself to multiple interpretations. At best, the disclaimer informed Holly that "there will be" physicians who *are* independent contractors, which implicitly allows that there will be physicians who *are not* independent contractors. Thus, unlike the consent forms in *Delegatto*, *Mizyed*, and *Lamb-Rosenfeldt* that utilized unequivocal terms, the consent forms in this case were not clear or unambiguous. See *Delegatto*, 2021 IL App (1st) 200484, ¶ 9 ("*ALL* PHYSICIANS" (emphasis added)); *Mizyed*, 2016 IL App (1st) 142790, ¶ 15 ("*all* physicians" (emphasis added)); *Lamb-Rosenfeldt*, 2012 IL App (1st) 101558, ¶ 4 ("*NONE* OF THE PHYSICIANS" (emphasis added)). Therefore, a question of fact exists as to whether Holly knew or should have known of the independent-contractor status of her physicians.

¶ 71 Riverside urges us to consider the five consent forms Holly signed in 2008 and 2009 as supporting evidence that she knew or should have known her treating physicians were not hospital employees because those forms contained clear and unambiguous disclaimers stating that "the physicians *** at [Riverside] are not agents or employees of the hospital." Even assuming, *arguendo*, that those consent forms were clear, we decline to apply them to the claims of

26

negligence alleged here. First, the 2008 and 2009 forms were signed 10 years before Holly's 2018 admission to Riverside and cannot reasonably be relied upon to inform Holly's understanding of whether the 2018 treatment providers were independent contractors. See, *e.g.*, *Brayboy v. Advocate Health & Hospital Corp.*, 2024 IL App (1st) 221846, ¶ 30 (consent form should be presented "at a meaningful time" in order to sufficiently disclaim reliance by a patient). Second, and more significantly, the 2018 form presented to Holly at the time of the alleged negligence contains dramatically different language that, as we have explained, inferentially suggests that the treating physicians may have been agents of the hospital. Simply put, the language contained in the most recent consent form, to the extent it departs from the previous consent forms, is the most relevant form in determining Holly's knowledge of her treating physicians' employment status.

¶ 72    As discussed, summary judgment is inappropriate unless the pleadings, depositions, admissions, and affidavits, construed liberally in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact. An issue of material fact arises when reasonable people might draw different conclusions from the facts. Here, there is sufficient evidence from which a reasonable factfinder could infer that the consent form did not notify Holly about the status of Drs. Whyte, Issa, and Errampalli as independent contractors. We therefore conclude that summary judgment was inappropriate as to whether Riverside was holding the doctors out as agents.

¶ 73                                2. *Justifiable Reliance Element*

¶ 74    On appeal, Riverside maintains that the summary judgment ruling on the plaintiff's apparent agency claims should also be affirmed because the plaintiff cannot establish the third factor—reliance. In appeals from summary judgment rulings, we review the judgment, not the reasoning of the circuit court, and we may affirm on any grounds in the record, regardless of whether the court relied on those grounds or whether its reasoning was correct. *Best Buy Stores,*

27

*L.P. v. Department of Revenue*, 2020 IL App (1st) 191680, ¶ 12. Thus, even though the circuit court did not rule on the element of justifiable reliance in granting Riverside's partial summary judgment motion, we must still consider whether that factor provides an alternative basis for affirming the court's ruling in Riverside's favor.

¶ 75    The justifiable reliance element of apparent agency may be satisfied if the plaintiff or person responsible for the plaintiff's care relied on the hospital itself to provide care, rather than a specific physician. *Gilbert*, 156 Ill. 2d at 525. A significant distinction exists between cases in which the plaintiff sought care from the hospital itself and cases in which the plaintiff merely looked to the hospital as a place where the plaintiff's personal physician provided treatment. *Id.* " 'An individual who seeks care from a hospital itself, as opposed to care from his or her personal physician, accepts care from the hospital in reliance upon the fact that complete emergency room care—from blood testing to radiological readings to the endless medical support services—will be provided by the hospital through its staff.' " *Id.* at 525-26 (quoting *Pamperin v. Trinity Memorial Hospital*, 144 Wis. 2d 188, 211-12, 423 N.W. 2d 848, 857 (1988)).

¶ 76    In this case, the depositions and admissions provide evidence of a triable issue of fact as to whether Holly relied on Riverside for her care. Dr. Nwakudu testified that he sent Holly to Riverside because it was the nearest hospital that could provide Holly with a higher level of care. Holly's son, Garrett, also testified that Riverside was the nearest medical facility that he and his family frequently visited for care and treatment. Moreover, although Holly informed Nurse Baker that her gastroenterologist, Dr. Sutherland, had privileges at Riverside, she was never treated by Dr. Sutherland when she was admitted to Riverside in May 2018, which suggests that she may have relied on Riverside, rather than a particular doctor, for her care. Thus, for purposes of

28

summary judgment, we conclude that the plaintiff presented sufficient evidence to satisfy the justifiable reliance element.

¶ 77    Riverside relies on our decision in *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, and claims that the plaintiff cannot show reliance on the hospital to provide medical care because the consent form Holly acknowledged stated that "the employment or agency status of physicians and other providers who treat me is not relevant to my selection of [Riverside] for my care." In *Steele*, we entered judgment notwithstanding the verdict for the hospital because the decedent patient signed a written consent form, similar to the form here, that disclaimed her reliance on choosing the hospital to provide care. *Id.* ¶ 141. In doing so, we emphasized that the consent form was the *only* evidence available and relied on its language to conclude that the plaintiff failed to prove the decedent justifiable relied on the hospital. *Id.* ¶¶ 131, 141 (holding that, because there was no other evidence available, the consent form was the "sole legally cognizable determinant" in evaluating whether the plaintiff proved apparent agency). When there is other evidence, however, consent forms are not dispositive. See *Hammer*, 2016 IL App (1st) 143066, ¶ 33 (reliance disclaimer did not support summary judgment for hospital because other evidence rebutted the form and created a triable issue of fact). Here, as we previously discussed, other evidence exists that creates a genuine issue of material fact that must be decided by the trier of fact at trial.

¶ 78    Because questions of material fact exist as to the holding out and reliance elements of the plaintiff's claim based on the doctrine of apparent authority, we conclude that the circuit court erred in granting Riverside partial summary judgment on this issue. We therefore reverse that portion of the court's order granting judgment in favor of Riverside and against the plaintiff as to apparent agency and remand for further proceedings.

¶ 79                              IV. CONCLUSION

29

¶ 80    The judgment of the circuit court of Kankakee County is reversed, and the cause is remanded for further proceedings.

¶ 81    Reversed and remanded.